## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. André M. Espinosa |
| | : | |
| v. | : | Mag. No. 24-11084 |
| | : | |
| VINCENT DISPOTO JR. | : | CRIMINAL COMPLAINT |
| | : | |
| | : | **FILED UNDER SEAL** |

I, Daniella Ganiaris, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_s/ Daniella Ganiaris_

Daniella Ganiaris, Special Agent
Federal Bureau of Investigation

Special Agent Ganiaris attested to this Complaint by telephone pursuant to F.R.C.P. 4. 1(b)(2)(A) on this 7th day of March, 2024

HONORABLE ANDRÉ M. ESPINOSA
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Count One
### (Wire Fraud)

From in or around December 1988 through in or around March 2024, in the District of New Jersey and elsewhere, the defendant,

## VINCENT DISPOTO JR.,

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute such scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, the following writings, signs, signals, pictures, and sounds.

| Approximate Date | Description |
| --- | --- |
| April 8, 2021 | DISPOTO caused Victim Investor 2 to transfer approximately $378,740 to a bank account that DISPOTO controlled via an interstate wire that passed through New Jersey. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## ATTACHMENT B

I, Daniella Ganiaris, am a Special Agent with the Federal Bureau of Investigation. I have conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation and have knowledge of the following facts. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause. All dates and dollar amounts described in this affidavit are approximate and all conversations and statements described in this affidavit are related in substance and in part.

### Overview

1.      Beginning in or around December 1988, defendant VINCENT DISPOTO JR. ("DISPOTO") fraudulently induced victims to send him money based on DISPOTO's misrepresentations that he would invest the victims' funds in low-risk investment products with guaranteed returns. In reality, DISPOTO failed to invest the victims' funds as promised, and instead misappropriated the funds for his own personal gain, causing victims millions of dollars in collective losses.

### Background

2.      At various times relevant to this Complaint:

a.      DISPOTO resided in Belmar, New Jersey, and controlled and operated Giddeon Financial Services ("Giddeon Financial"), a purported investment services fund with a principal place of business at various addresses in New Jersey, including in Morris Plains, Victory Gardens, and Manasquan. DISPOTO also provided tax preparer services through Giddeon Financial. In addition, DISPOTO controlled and operated Liberty Mortgage Services ("Liberty Mortgage"), a mortgage broker with an address in Manasquan, New Jersey that purportedly served as the "lending arm" of Giddeon Financial.

b.      Before starting Giddeon Financial, DISPOTO ran a company called Giddeon International Fund Inc. ("Giddeon International").

c.      "Victim Investor 1" was an individual investor residing in New Jersey and, later, California.

d.      "Victim Investor 2" was an individual investor residing in Wisconsin.

### The Scheme to Defraud

3.      DISPOTO began soliciting and receiving investment funds as early as in or around December 1988, when he sent a victim investor a prospectus for Giddeon International, which purported to be an "investment club" offering low risk and guaranteed returns based on investments focused on money market funds and government securities. Subsequently, for over three decades, DISPOTO principally used Giddeon Financial and Liberty Mortgage to solicit funds from victim investors— who were individuals and entities located across the country—based on promises that he would invest their money in low-risk investment products with guaranteed returns.

4.      In some cases, DISPOTO claimed to victim investors that their funds were being invested in municipal bonds, certificates of deposit, or other similar low-risk products. In other cases, DISPOTO told victim investors that their money was being used to fund mortgages that Liberty Mortgage provided to medical professionals at a reduced interest rate. For these mortgage-related investments, DISPOTO convinced victim investors to commit to a multi-year strategy through which they would purportedly earn back their principal and receive returns through the mortgagees' interest payments.

5.      Many of the victim investors either had a personal relationship with DISPOTO or were introduced to him by someone who did. The victim investors – many of whom were elderly – trusted that DISPOTO was investing their funds as he had promised, and DISPOTO even served as a tax preparer for certain of the victim investors.

6.      In reality, DISPOTO did not use the victim investors' money as promised.  Instead, he pooled most of the victim investors' funds into one Giddeon Financial bank account (the "Account"), which he used to make Ponzi-like payments to investors that he falsely claimed to be "returns" on their investments. DISPOTO also used the Account on personal expenses, including gambling, credit card payments, and brokerage accounts.

7.      To maintain and cover up his fraudulent scheme, DISPOTO caused victim investors to receive quarterly financial statements that falsely purported to show substantial profits—described as "interest"—that each victim investor had earned to date from DISPOTO's purported investments. These financial statements also claimed to identify the purported "tax status" of these non-existent investments. And when DISPOTO caused victim investors to receive Ponzi-like payments from the Account, DISPOTO falsely claimed that they were disbursements from victims' IRAs or other investment accounts.

8.      At times, victim investors asked for more money to be disbursed from their investment accounts, or to transfer all of the funds in their investment accounts to a different financial institution. In response, DISPOTO provided various bogus excuses as to why funds could not be made available, including:

        a.      an alleged ransomware attack on another entity that DISPOTO controlled, which purportedly rendered Giddeon Financial incapable of disbursing funds; and/or

        b.      the bankruptcy of a mortgage loan originator that DISPOTO falsely claimed held more than $10 million in Liberty Mortgage notes at the time the originator initiated Chapter 11 bankruptcy proceedings in or around June 2022.

9.      As recently as in or around February 2024, DISPOTO has continued to provide victim investors false excuses for why they could not recoup their investment funds.

10.      In total, DISPOTO's fraud victimized over 30 investors and resulted in combined losses of more than $5 million.

**Victim Investor 1**

11.      Victim Investor 1 first met DISPOTO in the 1980s. DISPOTO was a member of Victim Investor 1's wedding party, and Victim Investor 1 considered DISPOTO to be his best friend.

12.      Victim Investor 1 first invested money with DISPOTO in or around December 1988 after DISPOTO sent him the Giddeon International prospectus, discussed above. DISPOTO subsequently caused Victim Investor 1's money to be transferred to Giddeon Financial in or around early 1994, without Victim Investor 1's knowledge or consent. In total, Victim Investor 1 invested approximately $1.7 million with DISPOTO and DISPOTO-controlled entities.

13.      From at least in or around April 1992 through in or around September 2020, DISPOTO caused Victim Investor 1 to receive financial statements from DISPOTO's companies that purported to show the value of Victim Investor 1's investments growing substantially over time. For example, a financial statement from in or around September 2020, purported to show that the value of Victim Investor 1's investments with Giddeon Financial exceeded $2.7 million.

14.      From time to time, Victim Investor 1 received money that DISPOTO falsely characterized as disbursements from Victim Investor 1's investment accounts. The total amount of these "disbursements" was significantly less than the amount that Victim Investor 1 had invested with DISPOTO.

15.    Beginning in or around September 2018, Victim Investor 1 asked DISPOTO on numerous occasions to liquidate Victim Investor 1's investment accounts and transfer the funds to another financial institution. After initially ignoring Victim Investor 1's requests, and then telling him that funds would be made available in a few weeks' time, DISPOTO falsely told Victim Investor 1 in or around late 2019 that his investment funds were not available because DISPOTO or his entities had been the victim of a cyberattack.

16.    Subsequently, in or around February 2020, DISPOTO falsely claimed that he could not liquidate Victim Investor 1's accounts because Victim Investor 1's money had been used to finance mortgages, which would not become liquid assets until in or around late 2021 or 2022.

17.    DISPOTO ultimately never allowed Victim Investor 1 to liquidate the rest of his investment funds as requested.

**Victim Investor 2**

18.    Victim Investor 2 was introduced to DISPOTO through Victim Investor 2's parents, who had previously invested their money with DISPOTO.

19.    In or around June 2018, DISPOTO sent Victim Investor 2 an email describing a purported investment opportunity with Giddeon Financial, which would allegedly lend money to medical professionals seeking financing while obtaining degrees or starting a new practice. DISPOTO told Victim Investor 2 that she would receive monthly payments on her investment with Giddeon Financial based on interest and principal payments from the borrowers over a three-year term, and that she could expect to receive a 4.2% to 4.5% rate of return on her investment.

20.    DISPOTO sent Victim Investor 2 a follow-up email in or around September 2018, falsely stating, among other things, "This account is geared to supplement your retirement income . . . You need a guaranteed return [over] a certain amount of time," and "I have proven track records."

21.    Based on DISPOTO's false representations, Victim Investor 2 decided to invest and made multiple money transfers to DISPOTO and Giddeon Financial, which included wiring approximately $378,740 to the Account on or about April 8, 2021. That wire traveled interstate and passed through New Jersey.

22.    From time to time, Victim Investor 2 received money that DISPOTO falsely characterized as disbursements from Victim Investor 2's investment accounts. As with Victim Investor 1, the total amount of these "disbursements" was

significantly less than the total amount that Victim Investor 2 had invested with DISPOTO.

23.     Beginning in or around October 2023, Victim Investor 2 asked DISPOTO to liquidate her investment funds. Victim Investor 2 needed the money to help cover living expenses while she was in a nursing home following hip replacement surgery.

24.     In response, DISPOTO informed Victim Investor 2 that he needed "a little time to negotiate a payout quote" and had "to find out how a distribution can be accomplished without hurting you."

25.     DISPOTO ultimately never allowed Victim Investor 2 to liquidate her investment funds as requested.